## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

JOAN MANCUSO, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

NORTHWELL HEALTH, INC. and PERRY JOHNSON & ASSOCIATES, INC.,

      Defendants.

Case No.: 1:24-cv-00874

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Joan Mancuso ("Plaintiff") individually and on behalf of all others similarly situated (collectively, "Class members"), by and through the undersigned attorneys, brings this Class Action Complaint against Defendants, Northwell Health, Inc. ("Northwell") and Perry Johnson & Associates, Inc. ("PJ&A") (collectively, "Defendants") and complains and alleges upon personal knowledge as to Plaintiff and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action against Defendants for their failure to secure and safeguard over 3 million persons' personally identifiable information ("PII") and personal health information ("PHI") (collectively, "PII/PHI" or "Personal Information"), including name, date of birth, address, medical record number, hospital account number, and clinical information such as name of the treatment facility, healthcare providers, admissions diagnosis, and date(s) and time(s) of service.

2. Defendant Northwell Health, Inc. is a large private healthcare provider serving over 2 million patients annually in New York City, Long Island, and Westchester.

3.      Defendant Perry Johnson & Associates, Inc. is a third-party vendor that provides health information technology solutions used by Northwell.

4.      On or about May 2, 2023, PJ&A discovered unusual activity on its computer network systems and determined that an unauthorized third party had accessed its network and obtained certain files therefrom containing the PII/PHI of Plaintiff and Class members (the "Data Breach" or "Network Incident").

5.      Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect patients' PII/PHI from unauthorized access and disclosure.

6.      As a result of Defendants' inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action individually and on behalf of all natural persons who are residents of the United States whose Personal Information was potentially compromised in the Network Incident and who were sent via U.S. Mail notice by Defendants that their Personal Information may have been compromised in the Network Incident.

7.      Plaintiff, individually and on behalf of all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, and breach of implied contract, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

**PARTIES**

8.      Plaintiff Joan Mancuso is a New York resident. Plaintiff Mancuso received services from Northwell and, as a condition of receiving such health care services, Plaintiff provided PII/PHI or Plaintiff's PII/PHI was provided to Northwell. Upon information and belief, Northwell provided Plaintiff's PII/PHI to PJ&A in connection with the provision of medical transcription services. Plaintiff received a letter from PJ&A confirming that Plaintiff's PII/PHI was impacted by the Data Breach. Plaintiff Mancuso would not have accepted services from Defendants or agreed to have Defendants receive PII/PHI had Plaintiff known that Defendants do not and would not adequately safeguard PII/PHI.

9.      Defendant Northwell is a private not-for-profit healthcare provider organized under the laws of New York with its headquarters and principal place of business at 2000 Marcus Avenue, New Hyde Park, New York 11042.

10.     Defendant PJ&A is a Nevada corporation with its principal place of business at 1489 W. Warm Springs Road, Henderson, NV 89014.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, and at least one Class member is a citizen of a state that is diverse from Defendants' citizenship. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

12.     This Court has personal jurisdiction over Defendant Northwell Health, Inc. because it is a corporation incorporated under the laws of New York, has its principal place of business in New York, and does a significant amount of business in New York.

13.     This Court has personal jurisdiction over Defendant Perry Johnson & Associates, Inc., because it transacts routine business within this state, routinely enters into contracts within this state, and avails itself of the laws of this state.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1), because Northwell has its principal place of business located in this District, and a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### *Defendant Northwell Health Inc.'s Business*

15.     Northwell is a New York-headquartered private not-for-profit hospital serving New York City, Long Island, and Westchester. As the largest private healthcare provider in New York, Northwell treats over 2 million patients annually and employs over 79,000 employees.[1]

16.     Northwell has 21 hospitals and about 900 outpatient facilities and cares for more than 2 million patients annually. To do so, Northwell employs 85,000 workers, including 18,900 nurses, according to the health system's website.[2]

17.     In the regular course of its business and as a condition of receiving services from Northwell, Northwell collects and maintains the PII/PHI of patients, former patients, and other persons to whom it is currently providing or previously provided health-related or other services.

18.     Northwell requires patients to provide personal information before it provides them services. That information includes, *inter alia*, names, dates of birth, health records, insurance information, and other medical care related information.

---

[1]     *We are Northwell Fact Sheet*, NORTHWELL HEALTH, available at: https://www.northwell.edu/sites/northwell.edu/files/2022-04/we-are-northwell-fact-sheet-april2022.pdf (last accessed Feb. 1, 2024).

[2]     *About Northwell*, NORTHWELL HEALTH, available at: https://www.northwell.edu/about-northwell (last accessed Feb. 1, 2024).

19.     The information held by Northwell at the time of the Data Breach included the unencrypted PII/PHI of Plaintiff and Class members.

20.     Northwell made promises and representations to Plaintiff and Class members that the Private Information it collected would be safeguarded and kept confidential, and that Northwell would delete or otherwise dispose of any sensitive information in its possession that it was no longer required to maintain.

21.     Indeed, Northwell's "Patient Privacy Overview" begins by emphasizing that "patient privacy is an integral part of the health care we provide to you."[3]

22.     Northwell's "Patient Privacy Overview" ensures that:

> [W]e not only care for your well-being, *we are also committed to protecting the security and privacy of your personal health information*. We utilize sophisticated technologies and processes to protect your data, and we require that our external partners and vendors meet the same high standards we follow.[4]

23.     Plaintiff and Class members are, or were, patients of Northwell or received health-related or other services from Northwell, and entrusted Northwell with their PII/PHI.

24.     Plaintiff and Class members provided their Private Information to Northwell with the reasonable expectation and mutual understanding that Northwell and any third-party vendor it contracted with and/or to which it supplied PII/PHI—including PJ&A —would comply with its obligations to keep such information confidential and secure from unauthorized access.

25.     Plaintiff and Class members relied on the sophistication of Northwell to keep their Private Information confidential and securely maintained, to use this information for necessary

---

[3]     *Patient Privacy Overview*, NORTHWELL HEALTH, available at: https://www.northwell.edu/about-northwell/commitment-to-excellence/protecting-patient-privacy (last accessed Feb. 1, 2024).

[4]     *Id*. (emphasis added).

purposes only, to make only authorized disclosures of this information, and to dispose of such information once Northwell was no longer required to maintain it.

### *Perry Johnson & Associates, Inc.'s Business*

26.    PJ&A "provides medical transcription services to various healthcare organizations."[5]

27.    According to PJ&A's website, "[c]linical [d]ocumentation has been noted by hospital leaders as one of their greatest revenue cycle vulnerabilities as erroneous or incomplete details can lead to lost or decreased revenue."[6] Relatedly, PJ&A provides a web-based document management platform that offers "a robust transcription service for medical professionals."[7]

28.    PJ&A's web-based document management platform, which Northwell and other health-related customers used, was not adequately or properly secured from unauthorized access.

29.    Despite knowing that PJ&A's web-based document management platform left PJ&A's customers (like Northwell) and third parties interacting and transacting with its customers (like Plaintiff and Class members) exposed to security threats, PJ&A continued to offer, and Northwell continued to utilize, the product at the time of the Data Breach.

### *The Data Breach*

30.    On or about May 2, 2023, PJ&A discovered that an unauthorized individual, or unauthorized individuals, gained access to its computer network systems. PJ&A's internal investigation following discovery of the Data Breach revealed that an unauthorized actor accessed certain computer systems between March 27, 2023 and May 2, 2023, and may have accessed or

---

[5]    *Cyber Incident Notice*, PERRY JOHNSON & ASSOCS., available at: https://www.pjats.com/downloads/Notice.pdf (last accessed Feb. 1, 2024).
[6]    *Medical Transcription*, PERRY JOHNSON & ASSOCS., available here: https://www.pjats.com/portfolio/medical-transcription/ (last accessed Feb. 1, 2024).
[7]    *Id.*

copied certain information maintained within the PJ&A environment.

31.    Specifically, on May 22, 2023, PJ&A discovered that the unauthorized actor(s) had access to Northwell's patient data between April 7, 2023 and April 19, 2023, which PJ&A disclosed to Northwell on July 21, 2023.

32.    Defendants began to notify patients and other impacted individuals about the Data Breach around late October to early November of 2023, almost five months after learning of the incident, by mailing notification letters to individuals whose information may have been compromised in the Data Breach (the "Notice").

33.    The Notice provided the following:

PJ&A serves as a vendor to Northwell Health, Inc., and its subsidiaries and affiliates (collectively, "Northwell"). PJ&A provides certain transcription and dictation services to Northwell. In order to perform these services, PJ&A receives personal health information regarding Northwell patients.

**What Happened?**

PJ&A became aware of a data security incident impacting our systems on May 2, 2023. We immediately initiated an investigation and engaged a cybersecurity vendor to further provide support in connection with our investigation and secure against potential system vulnerabilities. We promptly implemented the cybersecurity vendor-recommended actions to prevent the further disclosure of data as we continued to investigate the situation. Through our investigation, we determined that the unauthorized access to our systems occurred between March 27, 2023 and May 2, 2023, and the unauthorized access to Northwell patient data specifically occurred between April 7, 2023 and April 19, 2023.

On July 21, 2023, PJ&A notified Northwell that an unauthorized party had accessed and downloaded certain files from our systems. PJ&A has preliminarily determined that Northwell data was impacted on May 22, 2023 and, by September 28, 2023, confirmed the scope of the Northwell data impacted.

**What Information Was Involved?**

We have confirmed that certain files containing your personal health information were impacted by this incident. Specifically, the following information may have been impacted: your name, date of birth, address, medical record number, hospital account number, and clinical information such as name of the treatment facility, the number of your healthcare providers, admission diagnosis, and date(s) and time(s) of service.

**What We Are Doing?**

We are committed to maintaining the privacy and security of your information and take this incident very seriously. PJ&A took, and will continue to take, appropriate steps to address this incident, including updating our systems to prevent incidents of this nature from occurring in the future. As soon as we learned of the unauthorized access to our systems, PJ&A immediately initiated an investigation and retained a cybersecurity vendor to assist with containing the threat and with further securing of our systems. PJ&A notified law enforcement about the incident and continues to cooperate with law enforcement's investigation.

34.    The Notice wholly failed to provide necessary details regarding the Data Breach, including whether Defendants know the identity of the perpetrators of the Data Breach, whether the information compromised was held for ransom, and what steps, if any, Defendants are taking to implement additional technical safeguards to enhance their computer systems.

35.    Upon information and belief, Plaintiff's and Class members' Private Information was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals who commit cyber-attacks of this type.

36.    Despite this, the Notice further fails to provide impacted persons with advice as to how to mitigate against any harm caused by the Data Breach or offer any credit monitoring and identity theft services.

***Defendants Knew that Criminals Target PII/PHI***

37.    At all relevant times, Defendants knew, or should have known, that Northwell's patients' PII/PHI was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that Defendants should have anticipated and guarded against.

38.    Cybercriminals seek out PII/PHI at a greater rate than other sources of personal information. In a 2021 report, the healthcare compliance company Protenus found that there were

758 medical data breaches in 2020, with over 40 million patient records exposed.[8] This was an increase from the 572 medical data breaches that Protenus compiled in 2019.[9] In 2021, 905 health data breaches were reported and, according to Protenus's assessment, although a record number of data breaches were reported, the impact of breaches continues to be underreported overall and underrepresented to the public.[10] In 2022, 956 health data breaches were reported in a steady increase year over year, with approximately 60 million patient records affected.[11]

39.    PII/PHI is a valuable property right.[12] The value of PII/PHI as a commodity is measurable.[13] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[14] American companies are estimated to have spent over $19 billion on acquiring

---

[8]    Protenus,    *2021    Breach    Barometer*,    PROTENUS.COM, https://www.protenus.com/resources/2021-breach-barometer (last accessed Feb. 1, 2024).

[9]    Protenus,    *2020    Breach    Barometer*,    PROTENUS.COM, https://www.protenus.com/resources/2020-breach-barometer (last accessed Feb. 1, 2024).

[10]    Protenus,    *2022    Breach    Barometer*,    PROTENUS.COM, https://www.protenus.com/hubfs/Breach_Barometer/BreachBarometer_Privacy_2022_Protenus. pdf?utm_campaign=Forbes%2520Articles&utm_source=forbes&utm_medium=article&utm_con tent=breach%2520barometer (last accessed Feb. 1, 2024).

[11]    Protenus,    *2023    Breach    Barometer*,    PROTENUS.COM, https://email.protenus.com/hubfs/Breach_Barometer/2023/BreachBarometer_Privacy_2023_Prot enus.pdf (last accesses Feb. 1, 2024).

[12]    *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"),
https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[13]    *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[14]    OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

personal data of consumers in 2018.[15] The data is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

40.    As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted health information, credit card numbers, Social Security numbers, and other sensitive information directly on various internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

41.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[16] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[17] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[18]

42.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers, and

---

[15]    IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[16]    *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[17]    *Id.*

[18]    *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[19] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[20]

43.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[21] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[22]

44.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[23]

45.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[19]    SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[20]    Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[21]    *What Happens to Stolen Healthcare Data*, *supra* at n.16.
[22]    *Id.*
[23]    Janice Y. Tsai, *et al.*, *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

### *Defendants Failed to Comply with FTC Guidelines*

46.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

47.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[24]

48.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

49.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

50.    The FTC has brought enforcement actions against businesses—specifically, healthcare providers—for failing to adequately and reasonably protect customer data, treating the

---

[24]    *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Feb. 1 2024).

failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

51.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

52.    Defendants failed to properly implement basic data security practices.

53.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

54.    Defendants knew of their obligations to protect the Private Information of patients, as well as the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants obtained and stored, and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class in the event a breach occurred.

### Defendants Failed to Comply with HIPAA Guidelines

55.    Defendants collect, maintain, and use health information of patients and are, thus, covered businesses under HIPAA (45 C.F.R. § 160.102) and are required to comply with the

HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("*Standards for Privacy of Individually Identifiable Health Information*").

56.     Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

57.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information applicable to Defendants, including a national set of security standards for protecting health information that is kept or transferred in electronic form

58.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302

59.     HIPAA's Security Rule requires Defendants to do the following:

   a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d.   Ensure compliance by its workforce.

60.     HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to

those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

61.    HIPAA and HITECH also obligate Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

62.    HIPAA further requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E, by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

63.    Defendants' failure to adequately safeguard the PII/PHI of patients and other affiliated persons from reasonably anticipated cyber-attacks, along with their failure to mitigate the resultant harm and damages, violates HIPAA.

### Defendants Had a Duty to Safeguard the Private Information

64.    In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class members to provide reasonable security, including compliance with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class members.

65.    Plaintiff and Class members were foreseeable and probable victims of Defendants' inadequate data security practices.

66.     Defendants owed a duty to Plaintiff and Class members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training employees and others who accessed Private Information within Defendants' computer systems on how to adequately protect Private Information.

67.     Defendants owed a duty to Plaintiff and Class members to implement processes that would detect a compromise of Private Information in a timely manner.

68.     Defendants owed a duty to Plaintiff and Class members to act upon data security warnings and alerts in a timely fashion.

69.     Defendants owed a duty to Plaintiff and Class members to disclose in a timely and accurate manner when and how the Data Breach occurred.

70.     Northwell also had a duty to adequately vet the vendors to which it supplies sensitive PII/PHI, including PJ&A, to ensure that the PII/PHI entrusted to those vendors would be safeguarded in the vendors' possession.

71.     Defendants failed to comply with and breached these duties of care.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

72.     Theft of PII/PHI is serious. The FTC warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[25]

---

[25]     *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Feb. 1, 2024).

73.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[26] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utility accounts; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; or use the victim's information in the event of arrest or court action.[27]

74.     With access to an individual's PII/PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[28]

---

[26]     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number". 12 C.F.R. § 1022.3(g).

[27]     *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[28]     *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Feb. 1, 2024).

75.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[29]

76.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[30] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[31] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [32] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use."[33]

77.    A report published by the World Privacy Forum and presented at the U.S. FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

---

[29]    Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Feb. 1, 2024).

[30]    Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/.

[31]    *See Health Care Systems and Medical Devices at Risk…, supra* at n.20.

[32]    *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Feb. 1, 2024).

[33]    *Id.*

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Perpetuation of debt collection and credit problems resulting from the sale of medical debts arising from identity theft.[34]

78.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it can take some individuals up to three years to learn this information.[35]

79.    It is within this context that Plaintiff and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

---

[34]    *See The Geography of Medical Identity Theft*, *supra* at 30.
[35]    John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

*Damages Sustained by Plaintiff and the Other Class Members*

80.    Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from the unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with attempts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) of overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

81.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

82.    Plaintiff brings this action individually and on behalf of all members of the following Classes of similarly situated persons:

**Nationwide Class**:

All natural persons who are residents of the United States whose Personal Information was potentially compromised in the Network Incident and were sent via U.S. Mail notice by PJ&A that their Personal Information may have been compromised in the Network Incident.

**New York Class**:

All natural persons who are residents of New York whose Personal Information was potentially compromised in the Network Incident and were sent via U.S. Mail notice by PJ&A that their Personal Information may have been compromised in the Network Incident.

83.    Excluded from the Class are: (1) the Judges presiding over the action and members of their families; (2) Defendants, their subsidiaries, parent companies, successors, predecessors,

and any entity in which Defendants or their parents, have a controlling interest, and their current or former officers and directors; (3) natural persons who properly submit a timely request for exclusion from the Class; and (4) the successors or assigns of any such excluded natural person.

84.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

85.    **Numerosity**: The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Upon information and belief, the Data Breach of PJ&A's health network systems implicated the PII/PHI of over 3 million former and current patients of Northwell.

86.    **Commonality**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.    Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII/PHI from unauthorized access and disclosure;

b.    Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII/PHI;

c.    Whether an express and/or implied contract existed between Plaintiff and Class members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

d.  Whether Defendants breached their duties to protect Plaintiff's and Class members' PII/PHI; and

e.  Whether Plaintiff and all other members of the Class are entitled to damages and the measure of such damages and relief.

87.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

88.    **Typicality**: Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

89.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

90.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be

impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Classes, as Against PJ&A)**

91.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

92.     PJ&A owed a duty to Plaintiff and all other class members to exercise reasonable care in safeguarding and protecting PII/PHI in its possession, custody, or control.

93.     PJ&A knew, or should have known, the risks of collecting and storing Plaintiff's and all other class members' PII/PHI and the importance of maintaining secure systems and using encryption, which it did not use. PJ&A knew, or should have known, of the many data breaches that targeted corporate entities in recent years.

94.     Given the nature of PJ&A's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, it should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

95.     PJ&A breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls,

policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and class members' PII/PHI.

96.    It was reasonably foreseeable to PJ&A that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and class members' PII/PHI to unauthorized individuals.

97.    But for PJ&A's negligent conduct or breach of the above-described duties owed to Plaintiff and class members, their PII/PHI would not have been compromised.

98.    As a result of PJ&A's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

## COUNT II
## NEGLIGENCE
### (On Behalf of Plaintiff and the Classes, as Against Northwell)

99.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100.    Northwell owed a duty to Plaintiff and all other class members to exercise reasonable care in safeguarding and protecting PII/PHI in its possession, custody, or control, and selecting vendors that would exercise reasonable care in safeguarding and protecting PII/PHI.

101.    Northwell knew, or should have known, the risks of collecting and storing Plaintiff's and all other class members' PII/PHI and the importance of maintaining secure systems or hiring vendors and third parties to do the same. Northwell knew, or should have known, of the many data breaches that targeted corporate entities in recent years.

102.    Northwell breached these duties by failing to exercise reasonable care in selecting a vendor that would safeguard and protect Plaintiff's and class members' PII/PHI.

103.    It was reasonably foreseeable to Northwell that its failure to exercise reasonable care—putting sensitive PII/PHI in the hands of a vendor that does not take data security seriously— and employ steps (e.g., encryption) to secure PII/PHI would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and class members' PII/PHI to unauthorized individuals.

104.    But for Northwell's negligent conduct or breach of the above-described duties owed to Plaintiff and class members, their PII/PHI would not have been compromised.

105.    As a result of Northwell's above-described wrongful actions, inaction, and want of ordinary care, Plaintiff and all other class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially

increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

### COUNT III
### NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Classes, as Against PJ&A)

106.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107.   PJ&A's duties arise from, *inter alia*, from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as PJ&A, of failing to employ reasonable measures to protect and secure PII/PHI.

108.   PJ&A's duties also arise from the HIPAA Privacy Rule ("*Standards for Privacy of Individually Identifiable Health Information*"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("*Security Standards for the Protection of Electronic Protected Health Information*"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "*HIPAA Privacy and Security Rules*").

109.   Plaintiff and class members are within the class of persons that Section 5 of the FTCA and HIPAA were intended to protect.

110.   The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTC Act and HIPAA are intended to guard against.

111.     It was reasonably foreseeable to PJ&A that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and class members' PII/PHI to unauthorized individuals.

112.     The injury and harm that Plaintiff and the other class members suffered was the direct and proximate result of PJ&A's violations of Section 5 of the FTCA and HIPAA.

113.     Plaintiff and class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vi) actual or attempted fraud.

### COUNT IV
### NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Classes, as Against Northwell)

114.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

115.     Northwell's duties arise from, *inter alia*, Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted by the FTC, the unfair act or practice by businesses, such as Northwell, of failing to employ reasonable measures to protect and secure PII/PHI.

116.    Northwell's duties also arise from the HIPAA Privacy Rule ("*Standards for Privacy of Individually Identifiable Health Information*"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("*Security Standards for the Protection of Electronic Protected Health Information*"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "*HIPAA Privacy and Security Rules*").

117.    Plaintiff and class members are within the class of persons that Section 5 of the FTCA and HIPAA were intended to protect.

118.    The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTC Act and HIPAA are intended to guard against.

119.    It was reasonably foreseeable to Northwell that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII/PHI and selecting a vendor that fails to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and class members' PII/PHI to unauthorized individuals.

120.    The injury and harm that Plaintiff and the other class members suffered was the direct and proximate result of Northwell's violations of Section 5 of the FTCA and HIPAA.

121.    Plaintiff and class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach

of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vi) actual or attempted fraud.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Classes, as Against Northwell)**

122. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

123. Plaintiff and Class members gave Northwell their PII/PHI in confidence, believing that it would protect that information. Plaintiff and Class members would not have provided Northwell with this information had they known it would not be adequately protected or provided to vendors that do not adequately protect PII/PHI. Northwell's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between Northwell and Plaintiff and Class members. In light of this relationship, and the relationship of a health provider/patient, Northwell must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class Members' PII/PHI.

124. Northwell has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. Northwell breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class Members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected.

125. As a direct and proximate result of Northwell's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i)

a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) of overpayment for the services that were received without adequate data security.

## COUNT VI
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Classes, as Against Northwell)

126.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

127.    In connection with receiving medical services, Plaintiff and all other Class members entered into implied contracts with Northwell.

128.    Pursuant to these implied contracts, Plaintiff and Class members paid money to Northwell, whether directly or through their insurers, and provided Northwell with their PII/PHI. In exchange, Northwell agreed to, among other things, and Plaintiff understood that Northwell would: (1) provide medical services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI, including adequately vetting vendors to which it provides PII/PHI to ensure that PII/PHI is secure in the hands of those third parties; and (3) protect Plaintiff's and Class members PII/PHI in compliance with federal and state laws and regulations and industry standards.

129.    The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Northwell, on the other hand. Indeed, as set forth *supra*, Northwell recognized the importance of data security and the privacy of its patients' PII/PHI in its "Patient Privacy Overview" and other Privacy Policies. Had Plaintiff and Class members known that Northwell would not adequately protect its patients' and former patients' PII/PHI, they would not have received medical services from Northwell.

130.    Plaintiff and Class members performed their obligations under the implied contract when they provided Northwell with their PII/PHI and paid—directly or through their insurers—for health care services from Northwell.

131.    Northwell breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

132.    Northwell's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

133.    Plaintiff and all other Class members were damaged by Northwell's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of

the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) of overpayment for the services that were received without adequate data security.

### **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, individually and on behalf of the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.


Dated: February 5, 2024                    Respectfully submitted,


_____
TINA WOLFSON (NY Bar # 5436043)
DEBORAH DE VILLA (NY Bar # 5724315)
**AHDOOT & WOLFSON, PC**
521 5th Avenue, 17th Floor
New York, NY 10175
Telephone: 917-336-0171
Facsimile: 917-336-0177
twolfson@ahdootwolfson.com
ddevilla@ahdootwolfson.com

ANDREW W. FERICH*
CARLYNNE WAGNER*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: 310-474-9111
Facsimile: 310-474-8585
aferich@ahdootwolfson.com
cwagner@ahdootwolfson.com

*Attorneys for Plaintiff and the Proposed
Classes*

***pro hac vice motions** to be filed*

## **ATTESTATION OF FILER**

I hereby attest that all signatories above have reviewed and concur with the filings of this document.

Dated: February 5, 2024                          _/s/ Tina Wolfson_____
                                                  Tina Wolfson